## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

This Affidavit is being submitted in support of an Application for a Search and Seizure Warrant for the following property seized from **Zoilo Camposano Gaerlan ("GAERLAN")** and **Benjie Sarmiento Montalban ("MONTALBAN")** at the National Security Agency ("NSA") in Fort Meade, Maryland on April 8, 2016:

    a. **One Quest Que cellular telephone, IMEI 1: 358337060003575, IMEI 2: 358337060003583;**

    b. **One black and silver Apple iPhone cellular telephone with a shattered screen and shattered black case, Model A1387;**

    c. **One white and gold Apple iPhone 6 Plus cellular telephone, Model A1522, IMEI: 354451065196393;**

    d. **One black Apple iPhone cellular telephone with a cracked front screen and the back piece broken and detached from the front of the phone, Model A303, ICID: 579C-A1303A;**

    e. **One white and gold Apple iPhone cellular telephone, Model A1453, IMEI: 357993058406492; and**

    f. **One black Samsung cellular telephone with a cracked screen and an AT&T logo above the cracked screen, Model SGH-1437P, IMEI: 357182051625833.**

The aforementioned property shall hereinafter be referred to as "TARGET PROPERTY."

## INTRODUCTION

1. As the result of this investigation, more fully described below, there is probable cause to believe that the TARGET PROPERTY contains evidence of criminal offenses, to wit: possession and distribution of controlled substances, in violation of 21 U.S.C. §§ 841 and 844; possession of firearms by a prohibited person, in violation of 18 U.S.C. § 922(g); and carrying firearms, in violation of 18 U.S.C. § 13 and Md. Code Ann., Crim. L. § 4-203. Since this affidavit is being submitted for the limited purpose of searching the TARGET PROPERTY, it is not intended to include each and every fact known to me or to the government. I have set forth only those facts necessary to support probable cause.

FILED ___ ENTERED
LOGGED ___ RECEIVED

JUL 08 2016

1

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

## TRAINING AND EXPERTISE

2.   I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of offenses enumerated in Title 18, United States Code, Section 2516, and to seek and execute search warrants. I have been a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") since October 2007. I was first assigned to the Sacramento Division. In July 2012, I transferred to the Baltimore Division. For the past 8 years, I have worked numerous violent crime matters, including gang and murder investigations, drug investigations, bank robberies and commercial robberies, and I investigate and charge individuals for federal firearms violations, including felon-in-possession. I have training and experience with reference to the National Firearms Act ("NFA"). Prior to my employment with the FBI, I was a Pennsylvania State Trooper with the Pennsylvania State Police ("PSP") for over twelve years.

3.   The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other investigators. This Affidavit is intended to show merely that there is sufficient probable cause and contains only such information as is necessary to establish probable cause for issuance of search warrants for the TARGET PROPERTY. Therefore, this Affidavit does not include each and every fact and matter observed by me, other investigators, or known to the government relating to the subject matter of this investigation.

## FACTS

4.   On April 8, 2016, **GAERLAN** and **MONTALBAN** arrived at Vehicle Control Point 2 ("VCP 2") of the National Security Agency ("NSA") in Fort Meade, Maryland, in a silver/gray 2014 Ford Mustang. **GAERLAN** was driving the vehicle, and **MONTALBAN** was

seated in the front passenger seat. They arrived at VCP 2 without NSA credentials and having no official business at NSA. When NSA Police officers discovered that **GAERLAN** and **MONTALBAN** had no official business at NSA, they directed **GAERLAN** and **MONTALBAN** to a secondary screening area, in accordance with standard protocol.

5.  Once at the secondary screening area, NSA police officers asked **GAERLAN** for his driver's license, and **GAERLAN** presented a Maryland driver's license. A check of the driver's license revealed that the license was suspended, and **GAERLAN** was taken into custody by NSA Police. NSA police officers removed from **GAERLAN**'s person a folding knife and a **Quest Que cellular telephone, IMEI 1: 358337060003575, IMEI 2: 358337060003583**. In accordance with protocol, NSA police officers began the process of taking a photograph of **GAERLAN**, and one police officer removed a baseball cap that **GAERLAN** was wearing. When the baseball cap was removed, officers observed two bags of suspected controlled substance that appeared to have fallen from the area of the inner band of the ball cap. The substance was later confirmed by a field test to be methamphetamine, a controlled substance.

6.  NSA police officers informed **GAERLAN** that the vehicle was going to be searched and, for officer safety, asked **GAERLAN** if there was anything in the vehicle that they needed to know about. After initially denying that there was anything in the vehicle that needed to be brought to the officers' attention, **GAERLAN** told a NSA police officer that there was a shotgun in the back of the vehicle.

7.  NSA police officers searched the trunk area of the vehicle behind the back seats and discovered a shotgun with a loaded magazine in that area. There were no rounds chambered but there were four green shotgun shells loaded in the magazine. The shotgun was a .12 gauge Saiga. Based on my training and experience, I know that Saiga shotguns are not manufactured in

Maryland, and there is probable cause to believe that the shotgun found in the vehicle was therefore transported to Maryland in interstate commerce.

8. During the search of the vehicle, NSA police officers also discovered in the area of the front passenger seat a blue backpack that contained various packages of suspected controlled substances, drug paraphernalia, and two cellular telephones. Specifically, the blue backpack included a zippered pouch containing multiple small zip-top baggies and a green glass pipe with residue of suspected controlled substance; and a black box containing a sealed baggie of a white crystal-like substance, a separate plastic baggie of white crystal-like substance, two open baggies of crystal-like substance and powdered residue, a baggie containing several smaller baggies of a cream-colored rock-like substance, and a baggie containing two white pills. The crystal-like substance field tested positive for methamphetamine, a controlled substance. The two cellular telephones found in the blue backpack were **a black and silver Apple iPhone with shattered screen and shattered black case, Model A1387**; and **a white and gold Apple iPhone 6 Plus, Model A1522, IMEI: 354451065196393**.

9. NSA police officers also discovered in the area of the floor directly behind the driver's seat a lunch bag that contained a revolver-style handgun, a black airsoft pistol, a hand grenade, and two rounds of ammunition. The revolver-style handgun was a Smith & Wesson .38 special revolver. Based on my training and experience, I know that this handgun is not manufactured in Maryland, and there is probable cause to believe that the revolver found in the vehicle was therefore transported to Maryland in interstate commerce. NSA police officers also found in the driver's side of the vehicle a small black scale, a white heat sealer, and a purple pipe with clear tubing. Based on my training and experience, I know that individuals involved in drug

trafficking regularly use scales to weigh portions of controlled substance and heat sealers to seal packages of such portions of controlled substance in preparation for sale.

10. Upon discovering the hand grenade, NSA police officers secured and evacuated the area surrounding the vehicle, and notified local and federal bomb squad assets. During inspection of the vehicle, explosive ordnance disposal technicians removed the contents of the vehicle, which included **a black Apple iPhone cellular telephone with a cracked front screen and the back piece broken and detached from the front of the phone, Model A303, ICID: 579C-A1303A; a white and gold Apple iPhone cellular telephone, Model A1453, IMEI: 357993058406492; a black Samsung cellular telephone with a cracked screen and an AT&T logo above the cracked screen, Model SGH-1437P, IMEI: 357182051625833**; a second shotgun magazine; a plastic bag containing a light brown powder substance and a plastic scoop; a length of black tubing with a glass bulb; and two clear pipes, one with apparent controlled substance residue. The light brown powder substance later tested positive for codeine, morphine, and heroin. The hand grenade was eventually determined by bomb squad personnel to be inert.

11. **GAERLAN** and **MONTALBAN** were transported from the scene by NSA police officers to an area outside of a NSA Police building. A NSA Special Agent informed **GAERLAN** of his Miranda rights and questioned **GAERLAN** about items found during the search of the vehicle. **GAERLAN** stated that the shotgun belonged to him and that he kept it for personal protection.

12. FBI SA Jonathan Shaffer and I arrived at NSA and were requested by NSA Police and NSA Special Agents to assist with the investigation, as the area where **GAERLAN** and **MONTALBAN** were encountered was on federal property and a territory in which the federal

government exercises exclusive law enforcement jurisdiction. This area is included within the "special maritime and territorial jurisdiction of the United States," as defined in 18 U.S.C. § 7.

13. NSA Police transported **GAERLAN** and **MONTALBAN** to U.S. Army Criminal Investigation Command ("Army CID") at Fort Meade. Once at Army CID, SA Shaffer and I interviewed **GAERLAN** and **MONTALBAN** separately.

14. At the beginning of his interview, **MONTALBAN** was read Miranda warnings, and he stated that he understood his rights and signed an Advice of Rights form. During the interview **MONTALBAN** admitted that the real handgun and fake gun found in the lunch bag behind the driver's seat of the vehicle belonged to him and that he had handled both guns. He stated further that he purchased the revolver in Maryland from another individual. He also stated that there were two rounds of ammunition in the bag that were for the revolver. He stated that he did not know of any other firearms in the vehicle. **MONTALBAN** described himself as a methamphetamine user and stated that **GAERLAN** was his methamphetamine supplier. He stated further he and **GAERLAN** had both been smoking methamphetamine from a pipe that was next to him in the car.

15. At the beginning of his interview, **GAERLAN** was read Miranda warnings and requested an attorney. SA Shaffer and I discontinued the interview at that point.

16. **GAERLAN** and **MONTALBAN** were transported to the Woodlawn Precinct of the Baltimore County Police Department and were detained.

17. A check of **GAERLAN**'s criminal history revealed that he is prohibited from possessing a firearm. In 2001, **GAERLAN** was convicted of Reckless Endangerment, in violation of Maryland Code, Article 27, Section 12A-2 (now codified at Maryland Code,

Criminal Law, Section 3-204), an offense punishable by imprisonment for a term of up to five years.

18. A database query performed by Maryland State Police revealed no permit for **MONTALBAN** to carry a handgun in Maryland.

19. Based on training and experience, I know that (a) many cellular telephones have an address/phone book feature, which allows the user to store names and telephone numbers in the telephone's memory; (b) many cellular telephones incorporate a Caller ID feature to capture and store the telephone number of incoming calls; (c) in addition to the ability to store names and numbers, many cellular telephones have the technical capability to store email, text, photographs, IP addresses, geographic locations and voice recordings; and (d) the analysis of the names, telephone numbers and other data contained in cellular telephones is very useful to law enforcement and provides valuable evidence concerning the scope of **GAERLAN**'s and **MONTALBAN**'s activities during the time period leading up to their encounter with law enforcement on April 8, 2016,.

20. Based on training and experience, I know that electronic devices, such as cellular telephones, can store information for long periods of time. This information can sometimes be recovered with forensics tools.

21. Based on training and experience, I know that those engaged in the sale of illicit drugs, including methamphetamine, will use telephones, including cellular telephones, to assist them with their drug trafficking endeavors. They will use cellular telephones to accept orders from drug customers and to assist them in determining locations to meet their customers to complete the drug transaction. Drug traffickers can use telephone calls and conversations, voice messages, text messages, and instant messages to communicate back and forth with their

customers. They will also use cellular telephones to contact their source of supply in order to "re-up" their drug supply from their sources of supply. I have known drug traffickers to take photographs and video of their drug customers and their drug suppliers, sometimes due to the nature of their relationship with the customer or supplier. These photographs and video can also be taken in or at social events if they travel in the same social circles. Drug traffickers will often store the contact information, including cellular telephone numbers, of drug customers and sources of supply in the "Contacts" area of their cellular telephone. They may attempt to hide the true name of the drug customer of source of supply by using an alias, initial, or some other description to annotate the actual customer or source of supply in the contacts of their cellular telephone. It should further be noted that the supplier/customer relationship can sometimes be determined through the analysis of text messages that are both sent and received. These text messages can sometimes determine the supplier/customer relationship based on who initiated the contact, such as who is requesting what and who is demanding payment. The content of the text messages can also contain specific information related to drug trafficking, including known drug terminologies, known drug amounts and the current cost of known drug quantities.

22.  As further described in the attachments to this Affidavit, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET PROPERTY was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET PROPERTY for the following reasons:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, examination of the device consistent with the warrant is permitted in that the examination may require authorities to employ techniques, including but not limited to

computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

24.     Based on the foregoing, I submit that there is probable cause to believe that the TARGET PROPERTY was used by **GAERLAN** and **MONTALBAN** and will contain evidence of the following offenses: possession and distribution of controlled substances, in violation of 21 U.S.C. §§ 841 and 844; possession of firearms by a prohibited person, in violation of 18 U.S.C. § 922(g); and carrying firearms, in violation of 18 U.S.C. § 13, and Md. Code Ann., Crim. L. § 4-203, to wit: stored data including names, addresses, telephone numbers, text and voice messages, instant messages, photographs, videos, and geographic locations.

Special Agent Sean P. Regan
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED
before me this _____ day of June, 2016.

STEPHANIE A. GALLAGHER
United States Magistrate Judge